16284

PARKER v. BATES, TREASURER, *ET AL.*
(56 S. E. (2d) 723)

*Messrs. Nettles & Horton and Benj. A. Bolt,* of Green-ville, *for Plaintiff,*

*Messrs. John M. Daniel, Attorney General, T. C. Callison and R. Hoke Robinson, Assistant Attorneys General,* of Columbia, *for defendants, and Robt. McC. Figg and O. T. Wallace,* of Charleston, *and Edgar A. Brown,* of Barnwell, *of Counsel for Defendants,*

November 18, 1949.

STUKES, Justice.

This action was brought in the original jurisdiction, in accord with prior permission, and heard at a special term in September 1949. It embodies attack by a Greenville citizen and taxpayer upon the validity of Act No. 344 of the Acts of the General Assembly of 1949, 46 Stat. 768.

It was entitled, "An Act to allocate funds to the counties of the State for the construction of health centers, hospitals or for other public purposes; and further relating to the fiscal affairs of the State." Section 1 appropriated from the general funds of the State, admittedly surplus, $2,584,000.00 to the respective counties at the rate of $40,000.00 per county plus $6,000.00 for each member of the House of Representatives. It was provided that the appropriations were, quoting, "for use in: (a) the erection of hospitals and/or health cen-

ters and/or for matching grants by the Federal Government for the erection of hospital and/or health centers, (b) for the purpose of paying off existing bonds sold for the erection and/or equipping of hospital and/or health centers. (c) for operation of county hospitals and/or health centers, (d) for purchase of equipment and supplies for hospitals and/or health centers, (e) for hospitalization of indigent citizens, (f) for any other eleemosynary hospitals in said counties whether or not such hospital is a county or municipal owned institution, (g) or in the event any health center or hospital has been erected and/or equipped with county funds, the sums herein provided may be used as reimbursement to such county of costs of such erecting and equipping thereof, and (h) and/or for other public uses."

Upon passage the Governor vetoed original provisions which gave control of expenditures in the counties to the respective legislative delegations, and these vetoes were sustained. Item (h) above was also vetoed by the Executive but the veto was overridden and it is a part of the law before us. The mechanics of this procedure were followed as outlined in the State Constitution of 1895, Art. IV, sec. 23. The veto power is a part of the legislative process. *Doran v. Robertson,* 203 S. C. 434, 27 S. E. (2d) 714.

In the brief of plaintiff the constitutionality of the act is challenged as follows:

I. The provision of the Act permitting the money to be used for privately owned eleemosynary hospitals is invalid because it is a grant of public funds for a sectarian purpose.

II. The provisions of the Act permitting the money to be used "for other public uses" is invalid because it fails to specify the uses.

III. The hospital and health center provisions of the Act are invalid because they constitute a use of State funds for a county purpose.

Our consideration might well be limited to the foregoing but other relatively minor points arose in oral argument, to

which we shall also make brief reference. General observations which are applicable will be first stated and then plaintiff's specifications of alleged unconstitutionality, reproduced above, will be discussed and decided seriatim.

██ Of primary importance are the long established rules which were concisely set forth in *Moseley v. Welch,* 209 S. C. 19, 39 S. E. (2d) 133, 137, as follows: "We approach the consideration of the various constitutional grounds upon which this legislation is challenged with the following well settled principles in mind: The supreme legislative power of the State is vested in the General Assembly; the provisions of our State Constitution are not a grant but a limitation of legislative power, so that the General Assembly may enact any law not expressly, or by clear implication, prohibited by the State or Federal Constitution; a statute will, if possible, be construed so as to render it valid; every presumption will be made in favor of the constitutionality of a legislative enactment; and a statute will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution. *Santee Mills et al. v. Query et al.,* 122 S. C. 158, 115 S. E. 202; *Clarke v. S. C. Public Service Authority et al.,* 177 S. C. 427, 181 S. E. 481; *Ellerbe v. David, County Treasurer, et al.,* 193 S. C. 332, 8 S. E. (2d) 518; *Pickelsimer v. Pratt et al.,* 198 S. C. 225, 17 S. E. (2d) 524." This quotation was also approvingly included in the opinion in the very recent decision of *Gaud v. Walker,* 214 S. C. 451, 53 S. E. (2d) 316.

██ Counties are subdivisions of the State, subordinate and subject to legislative control, created and existing with a view to the policy of the State and serving as its agencies. Generally speaking they function as such and as instrumentalities of the State for purposes of political organization and local administration. 14 Am. Jur. 185, 186, 188, Counties, §§ 3, 5. This conception of a county is supported by our decisions and many others which are cited in the footnotes to the text. *Chesterfield County v. State High-*

*way Department,* 191 S. C. 19, 3 S. E. (2d) 686, 698, and earlier cases cited in the opinion. There it was said: "The County is but an agency or arm of the State for governmental purposes, and privileges conferred upon counties and grants to them by the State, such as those here said to exist, are merely for the more convenient performance of the State's governmental functions". Plaintiff is prone in argument to disregard the true status of a county and to treat it as a sovereignty separate and apart from the State with distinct revenues and purposes, which it is not. 20 C. J. S., Counties, § 1 p. 755. Except for the constitutional provisions relating to counties they are subject to the plenary control of the legislature of the State, even to the extent of abolishment.

"Generally, where a surplus remains after the accomplishment of the purpose for which an appropriation is made, it may be diverted to other causes," which means "causes" for which taxes may have originally been levied. 42 Am. Jur. 776, Public Funds, § 80. Annotation, Ann. Cas. 1917B, 867. Manifestly there can be no unconstitutional diversion of surplus funds, as there was in the legislation condemned in *State ex rel. Edwards v. Osborne,* 193 S. C. 158, 7 S. E. (2d) 526, and in the second suit of the same title, *State ex rel. Edwards v. Osborne,* 195 S. C. 295, 11 S. E. (2d) 260. See the tangent case of *State ex rel. Brown v. Bates,* 198 S. C. 430, 18 S. E. (2d) 346.

There is no established segregation of tax sources between State and counties. Both may levy *ad valorem* taxes on property but the State has found it unnecessary to do so in recent years, depending upon excises, income taxes and the like. Likewise the counties may, and do, derive income from licenses of various kinds, road taxes, etc. In impressive amounts the proceeds of numerous levies by the State are in part divided annually among the counties by varying formulae, which proves the inaccuracy of the argument that the counties are confined in the accomplishment of their constitutional purposes to "county taxes." The follow-

ing is from the State appropriation act of 1948, sec. 69, 45 Stat. at Large, page 2178:

"Item 1.   Aid to Counties:

| | |
|---|---:|
| Income Tax | $ 1,875,000.00 |
| Alcoholic Liquors Tax | 2,546,000.00 |
| Beer and Wine Tax | 378,000.00 |
| Insurance Tax | 475,000.00 |
| Bank Tax | 120,000.00 |
| Motor Vehicle Dealers' Licenses | 40,000.00 |
| Gasoline Tax | 3,400,000.00 |
| Game Protection Fund | 110,000.00 |
| Total (Item 1) Aid to Counties | $ 8,944,000.00" |

Hospitalization and other aid to the sick have constituted approved governmental activities for many generations and this court had recent occasion to expressly declare that expenditures therefor by state and county may be validly made under our constitution. *Smith v. Robertson,* 210 S. C. 99, 41 S. E. (2d) 631. To the same effect is the older case of *Battle v. Willcox,* 128 S. C. 500, 122 S. E. 516.

Since hospitalization and other aid to indigent sick is a proper state purpose there is no constitutional or other legal reason why the State could not from its tax funds erect and maintain a hospital in every county, of uniform size and expense. This will hardly be done for the needs vary in the counties on account of their respective populations and available existing hospitals and other health conditions and facilities. However, the consideration demonstrates the validity of the lump sum appropriation of $40,-000.00 per county. The legislature went further, in recognition of the larger needs of the heavier populated counties, and provided $6,000.00 additional to each county per member of the House of Representatives, and the number of members per county is measured by relative county population. Const., Art. III, sec. 3. This partial uniformity in the distribution among the counties is not embraced in plain-

tiff's "questions involved" but it was referred to in oral argument and has been considered without avail to plaintiff. It cannot fairly be said to be arbitrary or capricious.

There is a compelling, practical reason for a uniform starting sum for each county, here $40,000.00. A health center building is apt to cost as much to build in a small, poor county as in a comparatively large, rich one; and as much to equip and maintain. Administrative expense is also likely to vary little, compensation of skilled personnel, etc. Health centers have been here referred to rather than hospitals because the aggregate sum which will accrue to the largest county is pitifully inadequate in relation to the present-day cost of a hospital. It can at best be but a modest contribution to such an institution. The statement went unchallenged in argument that the current construction cost of hospitals· is about $10,000.00 per patient-bed.

Plaintiff's first point of attack anticipates use of the appropriated funds for the aid of sectarian hospitals but no instance of attempt or intention to so apply any part of the funds is specified. The pertinent constitutional provision is quite broad, Art. XI, sec. 9, as follows: "The property or credit of the State of South Carolina, or of any county, city, town, township, school district, or other subdivision of the said State, or any public money, from whatever source derived, shall not, by gift, donation, loan, contract, appropriation, or otherwise, be used, directly or indirectly, in aid or maintenance of any college, school, hospital, orphan house, or other institution, society or organization, of whatever kind, which is wholly or in part under the direction or control of any church or of any religious or sectarian denomination, society or organization."

The following is quoted from 42 Am. Jur. 767, Public Funds, § 66: "Under a constitutional prohibition that no appropriations shall be made for charitable purposes to any denominational or sectarian institution, it has been held that the department of welfare cannot contract, or expend funds appropriated for its use, for the treatment of indigent sick in

sectarian hospitals. The fact that a sectarian hospital makes no profit from treatment of indigent sick does not prevent the operation of the constitutional provision that no appropriations shall be made for charitable purposes to any denominational or sectarian institution." See also, annotation, 142 A. L. R. 1083.

In the recent (1949) case of *Kentucky Building Commission v. Effron,* 310 Ky. 355, 220 S. W. (2d) 836, the Court of Appeals of Kentucky had before it an act of the legislature of that state which was passed, like ours before us now, to take advantage of the federal act, 42 U. S. C. A. § 291 *et seq.,* providing aid to States and their subdivisions in the construction and operation of hospitals and medical centers, whereby allocation of State tax funds to non-profit, non-publicly owned hospitals was authorized. It was held that church-founded and controlled hospitals might be included in the allocation if they were operated on a non-profit basis, open to the public of all creeds and not teaching religion or preferring any one sect over another. We are not prepared to go so far and we think the plain meaning of our constitution is that no public funds may be allocated in any manner to any hospital or health center which is, quoting, "wholly or in part under the direction or control of any church or of any religious or sectarian denomination, society or organization." Distinction is found in the varying provisions of the Kentucky and South Carolina constitutions, which will appear from a reading of the cited decision.

However, as indicated, no attempted or intended violation is alleged as in view and it may not be assumed that the governing board of any county will violate the constitution in the application of funds. If such situation should arise in the future in any county, the courts are open for appropriate preventive action.

The second point made by plaintiff has given more concern. It avers the unconstitutionality of item (h) which, quoted above, is an alternative appropriation for other public uses. We have seen that the seven preceding

items all relate to public health, hospitals and health centers and payment or refund of the cost of construction, equipment and maintenance of them. It is argued by the defendants that item (h) constitutes a valid grant of state funds in aid of the counties for county purposes, to wit, any purposes within the constitutional sphere of the county. However, we are constrained to hold that the argument is untenable in view of the expressed public health purpose of the act which is evidenced by the numerous preceding provisions all closely knit to that end. The legislative purpose is not evident to make a blanket grant in aid of the counties as is regularly done in the general appropriation acts, to which we have adverted, and the appropriation here cannot fairly be taken to be such, but is one, as seen, for aid of the counties in solution of the problem of public health. Item (h) is foreign to the manifest purpose of the act, and for that reason invalid. If allowed to stand, it might cause defeat of the purpose in one or more counties.

Plaintiff particularly invokes an excerpt from sec. 23 of Art. IV of the constitution, constituting one sentence of a lengthy paragraph, as follows: "Bills appropriating money out of the Treasury shall specify the objects and purposes for which the same are made, and appropriate to them respectively their several amounts in distinct items and Sections." More will be later said concerning the section from which the quoted sentence is taken and the context will clarify the intent of it. This final item (h) is, as has been said, a departure from the scheme of the act and, in that setting, does not comport with the cited provision, which was undertaken in this instance to be followed by the legislature, and should, we think, be stricken as unconstitutional. This holding should not be construed to question the ordinary grants in unspecified aid to the counties contained in the State general appropriation acts. Plaintiff concedes the propriety of the latter which his counsel denominated in argument "kickbacks" to the counties.

Reason for the distinction exists in the fact that the now customary grants in aid to the counties are taken into ac-

count in the general State appropriation acts (see quotation from that of 1948, *supra*), and are also regularly anticipated in the several county supply acts which provide for the expenditure of the grants and other county funds in conformity with the constitutional plan of State appropriations upon which plaintiff relies. In the act before us the legislature set out to itemize. which was done to include seven kindred, specified public uses or purposes, but all of that careful handiwork would be undone by sustention of the alternative, incongruous appropriation for "other public use."

The Governor accurately appraised the legislation and said in his veto message, in part, as follows: "I am in entire agreement with the fundamental purpose of this legislation, which is to encourage the development of South Carolina's health program by furnishing State funds to assist the counties of the State in providing hospital and health center facilities, as a means of giving the people of every section of South Carolina an opportunity to obtain better medical and surgical care and treatment.

"Because of the importance of this health program to our people, I approve this Act with the exception of the following items, which I hereby veto:   *   *   *"

Part of plaintiff's attack upon this item, which is based upon the foregoing quotation from Art. IV, sec. 23, of the constitution, is attempted to be also related by him to sec. 3 of Art. X which is: "No tax shall be levied except in pursuance of a law which shall distinctly state the object of the same; to which object the tax shall be applied." This provision was successfully invoked in the gasoline tax diversion cases of *State v. Osborne, supra,* but is irrelevant here because the funds appropriated are surplus funds. The point is elaborated in the outset observations, *supra.* To the authorities there cited to that point may be added the opinion of Justice McIver in *State ex rel. Branch v. Leaphart,* 11 S. C. 458, which involved State treasury surplus and the applicable constitution (of 1868) was the same in this respect as the present (1895). The taxes which resulted in the surplus

now appropriated were levied for the support of the government and it was expressly held in *Alderman v. Wells,* 85 S. C. 507, 67 S. E. 781, 785, 27 L. R. A., N. S., 864, 21 Ann. Cas. 193, that an act entitled "to raise revenue for the support of the state government  *   *   *" is, quoting, "a distinct statement of the object to which the tax shall be applied." Thus plaintiff's contention of unconstitutionality of item (h) is not precisely in point but the substance of it is upheld for the reason and upon the ground which we have stated.

In view of the foregoing sustention of plaintiff's point II his point III may properly be disposed of almost as briefly as he states it. The contention is that the entire appropriation is invalid because it would constitute a use of State funds for county purposes. But hospitals and health centers, to which the appropriation will be limited under this decision, are a State purpose as well as a county purpose and there is no constitutional or other legal barrier of which we know that prevents the State from dealing with the problem through the agency of its governmental subdivisions, to wit, the counties. There is no comfort to plaintiff in this contention to be found in *Smith v. Robertson, supra,* 210 S. C. 99, 41 S. E. (2d) 631. It merely involved the power of the county to issue bonds and use the proceeds in aid of the establishment of a State hospital within the county, which has no material bearing upon the question which plaintiff would make. The argument is that the decision was in contemplation of a supposed principle that State funds must be used for State purposes and county funds for county purposes. However, that case expressly held that a hospital is a proper State purpose and likewise a proper county purpose as, we add, a health center is. A citizen and taxpayer is no less a citizen of the State because he happens to live in one county rather than another. Plaintiff fallaciously says in his brief: "The State builds and operates hospitals for the benefit of the people of the State, whereas a county builds and operates a hospital for the bene-

fit of the people of that county." There is no such distinctive citizenship. The people of every county are the people of the State, and it is quite common knowledge that frequently people are patients in hospitals of other than their respective counties.

Equality of the burden of taxation is, we agree, a ██ ██ fundamental requirement of the constitution. Art. X. And further we recognize the existence of the principle that the rule of equality and uniformity may be violated by a discriminatory method of distribution of the proceeds of taxation. 51 Am. Jur. 219, 220, Taxation, sec. 165. *Commonwealth v. Alden Coal Co.*, 251 Pa. 134, 96 A. 246, L. R. A. 1916 F., 154. However, this case does not present any such unfair distribution of the benefits of taxation as is condemned by the cited authorities. On the contrary, it comports with the rule stated with reference to the distribution of funds in aid of public education in *Murph v. Landrum*, 76 S. C. 21, 33, 56 S. E. 850, 854, as follows: "The idea of apportionment of the public school fund involves a division or distribution among counties or school districts according to some reasonable and uniform rule. It is true the General Assembly has discretion to determine the particular rule of apportionment, as, for example, whether it shall be according to population of school age in the respective counties, or according to the enrollment of pupils, or according to the average attendance, or according to some other rule having reasonable relation to the purpose to be subserved by a public school fund and operating throughout the state upon all counties or school districts falling within the reasonable rule or classification. (If) it is to be conceded that while a classification may be adopted so as to deny to one county and give to another the rule of apportionment must be based upon reasonable difference of condition or situation, as, for example, greater illiteracy or less ability to meet the education demands in one county than in another; but the rule of apportionment shall have uniform application to all within the designated class."

There arises the question whether the conclusion that item (h) is invalid vitiates the whole law or it subsists with that elimination. There are two independent and equally sound reasons for the decision we reach that the law survives the striking out of item (h). First, it falls within the general rule which was last applied in *Gaud v. Walker, supra,* 214 S. C. 451, 53 S. E. (2d) 316, 329. A substantial and important part of the act involved in that case was stricken as unconstitutional and the remainder sustained with the comment, without citation of authority, as follows: "When this portion of the Act is eliminated, that which remains is capable of being executed in accordance with the legislative intent, wholly independent of that which has been rejected." . Shortly prior to that decision we said in *Moseley v. Welch, supra,* 209 S. C. 19, 39 S. E. (2d) 133, 144, where a county school act was upheld after numerous provisions were condemned as unconstitutional, again deeming citation of authority unnecessary, that the remaining valid portions constituted, quoting, "a complete act in itself, capable of being executed independently of the unconstitutional parts without doing undue violence to the legislative intent." Neither of these decisions referred to the saving clause, much less relied upon it.

Many other similar decisions from this court may be found by reference to 30 S. E. Dig. 717 *et seq.* and pocket part supplement, Statutes, Par. 64. The subject is there captioned as follows: "Although a statute may be invalid or unconstitutional in part, the part that is valid will be sustained where it can be separated from that part which is void." Here the legislature itself has separated the item which we hold void and without it the Act is entirely complete and capable of being executed in accordance with the legislative intent. It will be noted from a reading of the decisions which have been cited and referred to that the rule is not dependent upon the modern legislative device of a saving clause, mentioned above. The rule originated

long before such clause came into occasional use. 11 Am. Jur. 834 *et seq.*, 846 *et seq.*

Indeed, the doctrine of partial invalidity very soon followed the recognition of the power of a court to void legislation for unconstitutionality at all. The establishment of this very delicate judicial power was gradual because of regard for the constitutional plan of equality and independence of the three separate departments of government, namely, the legislative, the executive and the judicial. The doctrine under discussion, to wit, partial invalidity, naturally and quickly followed because of the ideal of separation and independence of each of the several branches of government and the reluctance of the courts to encroach upon it. It is universally held that a court should proceed most carefully in the exercise of this, its highest, prerogative, and go no further than it deems absolutely necessary in declaring unconstitutional and void the considered action of the legislature which is composed of the people's popularly elected representatives; but it is justified in going that far, and no further, in order to uphold the constitution because it is the charter of government adopted by the people directly or through their representatives. Properly hesitant to proceed at all in such cases, a court will go no further than it feels impelled in order to uphold the constitution. Invalidation of a separable part of a legislative act without impairment of the remainder logically results. Illustrative cases from our courts which are much older than the invention of the saving clause are the following: *State v. Carew,* 13 Rich. 498, 91 Am. Dec. 245; and *Wardlaw v. Buzzard,* 15 Rich. 158, 94 Am. Dec. 148, where it was said: "It was not contended seriously that if one part of an Act was unconstitutional, it vitiated the whole   *   *   *."

> Plaintiff argues that the stated rule is not applicable ▮ to this Act because the fact that the legislature overrode the veto of item (h) shows that the body would not have passed the Act without inclusion of it and therefore

sustention of the remainder would violate the legislative intent. We think this is an assumption without supporting fact or reason and no precedent is cited. On the contrary, in the case of appropriation acts the legislature is quite used to executive vetoes and support or defeat of a veto has never been considered of importance in determining the legislative intent concerning passage of such an act, regardless of the fate of the vetoes. Impotence of the argument is seen in the light of the consideration that the legislative intent is thwarted in part in every case of invalidation of a portion of an act for unconstitutionality, yet validity of the remainder is the rule rather than the exception as is seen by the results of the cases collected in 30 S. E. Dig. and supplement, cited *supra*.

The second consideration which we apply to the question whether the act is a valid law sans item (h) is likewise conclusive in itself of validity. It is the effect of the provisions of section 23 of Art. IV of the constitution. They are in much detail with reference to the participation of the Executive in legislation, his power of veto and how such shall be handled by the legislature. It is plain with respect to the authorization of the veto of any item or section of an appropriation bill, which that before us is. The pertinent portion of the constitution is here quoted from the cited section: "Bills appropriating money out of the Treasury shall specify the objects and purposes for which the same are made, and appropriate to them respectively their several amounts in distinct items and Sections. If the Governor shall not approve any one or more of the items or Sections contained in any Bill, but shall approve of the residue thereof, it shall become a law as to the residue in like manner as if he had signed it. The Governor shall then return the Bill with his objections to the items or Sections of the same not approved by him to the House in which the Bill originated, which House shall enter the objections at large upon its Journal and proceed to reconsider so much of said Bill as is not approved by the Governor. The same proceedings

shall be had in both Houses in reconsidering the same as is provided in case of an entire Bill returned by the Governor with his objections; and if any item or Section of Said Bill not approved by the Governor shall be passed by two thirds of each House of the General Assembly, it shall become a part of said law notwithstanding the objections of the Governor."

If the residue of an appropriation bill is a valid act after veto of items or sections, and the veto or vetoes upheld, it should follow that the court is ordinarily bound to similarly uphold an appropriation act after voiding an item or section for unconstitutionality. This course seems to be dictated by the provisions of the constitution, to which of course the courts are subject. This difference between a bill or act appropriating money from the State treasury and other bills or acts was noted in the opinion in *Doran v. Robertson, supra,* 203 S. C. 434, 443, 27 S. E. (2d) 714, 717. The Executive power of veto is ordinarily exercised only with respect to the whole of a bill or joint resolution but with reference to bills appropriating money from the State treasury the constitution expressly makes an exception to the rule and as to them the veto may go to any items or sections without impairing the residue. Surely the courts should generally follow suit and not invalidate an entire appropriation act because of the necessity to declare unconstitutional one or more items or sections of the act.

It was alleged in the complaint and suggested in oral argument that the questioned appropriation is invalid for lack of designated administrators in the counties to discreetly expend the funds, but no authority was cited and we know of none which would sustain the objection. Certainly an appropriation by the State to a county implies the right of expenditure in accord with the terms of the appropriation act, and they are rather detailed here. Every county has a governing board or commission, by whatever name called. Chapter 116, Civil Code of 1942, Vol. 2, p.

1042 *et seq*. It happens that the broad powers of the governing board of plaintiff's county were discussed in *Ex parte Greenville County*, 190 S. C. 188, 2 S. E. (2d) 47. Undoubtedly it is empowered to administer the funds which will be distributed to that county. We have just held that the legislature may vest a county governing board with power to levy taxes, make appropriations, incur indebtedness and issue bonds for county purposes. *Gaud v. Walker, supra*, 214 S. C. 451, 53 S. E. (2d) 316. In comparison, the implied power to expend this appropriation under the terms of the act appears picayune. There will accrue to Greenville, the largest county, $94,000; to the smallest, $46,000. See apportionment in the House of Representatives, Act 602, 1942. 42 Stat. 1510. The sum appropriated when divided in almost any fashion among the forty-six counties will not yield a very large quotient.

It may be noted that the problems presented by this litigation are not apt to often recur. A sizable State surplus is something new under the sun in South Carolina and at the rate illustrated by this Act will not long survive.

Our judgment is that the act under attack, No. 344 of 1949, is valid except the appropriation item (h) which is stricken as unconstitutional; injunction is denied with respect to the other, valid provisions of the act, and the temporary restraining order heretofore issued is dissolved.

BAKER, C. J., and FISHBURNE, J., concur.

TAYLOR and OXNER, JJ., dissent.

OXNER, Justice (dissenting).

The Court holds (1) that the provision of the Act (Item If) authorizing the expenditure of the amounts appropriated to the respective counties "for other public uses" is unconstitutional; and (2) that although Item (f) permits the use of public funds to aid sectarian hospitals which is found to be an unconstitutional purpose, this provision is valid because the assumption is that the funds will not be so used by the governing authorities of the respective counties. After

undertaking to separate the unconstitutional part of the Act, the Court then declares the remaining portion valid, which I think is clearly judicial legislation.

I am in accord with the conclusion that Item (h) is invalid but do not agree that it can be stricken upon the ground that it "is foreign to the manifest purpose of the Act", and "if allowed to stand * * * might cause defeat of the purpose in one or more counties." Nor can this provision be eliminated by characterizing it as "incongruous". "A court is not permitted to adopt a restrictive construction which would be the mere arbitrary decision of the court, and in effect would amount to a redrafting of the law, in order to make it conform to that which in the view of the court should have been originally enacted by the legislative body." 11 Am. Jur. Constitutional Law § 100, page 735. Item (h) is invalid, I think, because it fails to specify "the objects and purposes" for which the appropriation is made. The power, and with it the correlative duty and responsibility, of designating the objects for which public funds are to be expended rests upon the General Assembly except where that power has been delegated under applicable constitutional provisions. It has not been delegated to the corporate authorities of any county in this State except Charleston. *Gaud v. Walker et al.*, 214 S. C. 451, 53 S. E. (2d) 316.

"The principle that a statute may be constitutional and valid in part and unconstitutional and invalid in part is generally recognized. The rule is that where a part of a statute is unconstitutional, if such part is so connected with the other parts as that they mutually depend upon each other as conditions and considerations for each other, so as to warrant the belief that the Legislature intended them as a whole, and if they cannot be carried into effect, the Legislature would not have passed the residue independently of that which is void, the whole act is void. On the other hand, where a part of the statute is unconstitutional, and that which remains is complete in itself, capable of being exe-

cuted, wholly independent of that which is rejected, and is of such a character as that it may fairly be presumed that the Legislature would have passed it independent of that which is in conflict with the Constitution, then the courts will reject that which is void and enforce the remainder." *Townsend v. Richland County et al.,* 190 S. C. 270, 2 S. E. (2d) 777, 781. Substantially to the same effect is the following language from *Pollock v. Farmers Loan & Trust Co.,* 158 U. S. 601, 15 S. Ct. 912, 920, 39 L. Ed. 1108: "It is undoubtedly true that there may be cases where one part of a statute may be enforced, as constitutional, and another be declared inoperative and void, because unconstitutional; but these are cases where the parts are so distinctly separable that each can stand alone, and where the court is able to see, and to declare, that the intention of the legislature was that the part pronounced valid should be enforceable, even though the other part should fail. To hold otherwise would be to substitute for the law intended by the legislature one they may never have been willing, by itself, to enact."

The Act under consideration contains no saving clause. "The principles which underlie the application of the saving clause have been well established. In the absence of a legislative declaration that invalidity of a portion of a statute shall not affect the remainder, the presumption is that the legislature intends the act to be effective as an entirety. The effect of such a statutory declaration is to create, not the presumption of entirety in effect ordinarily accorded to statutes, but an opposite presumption of separability." 11 Am. Jur., Constitutional Law, § 156, page 847. Of course, those presumptions are rebuttable and the rule mentioned is merely an aid to interpretation. The ultimate inquiry is the intent of the lawmakers.

The foregoing principles will first be applied to Item (h). When this provision is eliminated, is the remaining portion of the Act "capable of being executed in accordance with the legislative intent, wholly independent of that which has been rejected"? *Gaud v. Walker, supra.* In determining this

question, it is important to consider the purpose of Item (h). The following explanation of this provision in the brief of defendants' counsel stands unchallenged on the record: "Some of the counties have no hospitals, or health centers; others amply possess such facilities and further extensive expenditures for their support would amount to a duplication of effort and consequent waste of funds, whereas there may at the same time be 'other public uses' to which the apportionment of funds would be of inestimable value. In this view the objects and purposes of the appropriation are clearly shown within the meaning of the constitutional provision." It appears from this statement that Item (h) instead of being "incongruous", is inextricably connected with the general plan contemplated by the Act for the distribution of the state surplus, and was included for the definite and specific purpose of compensating those counties not in need of additional hospital facilities. If, as defendants' counsel concede, there are some counties now adequately furnished with health centers and hospital facilities, I am at a loss to understand the basis of the factual conclusion in the majority opinion that "there is a compelling, practical reason for a uniform starting sum for each county, here $40,000." The purpose of this legislation was not solely to provide additional health and hospital facilities because it expressly authorizes the use of the funds to reimburse a county for the cost of those already erected and equipped. If the Act had not contained Item (h), could the proponents of this legislation have secured the requisite number of votes to override the Governor's veto? If the General Assembly had not authorized the use of the funds for any public purpose, can we say the amount of the lump sum appropriated would have been the same, or can we be assured that the basis of the allotment to the respective counties would have been the same? It seems entirely unreasonable to conclude that the General Assembly would have passed this act if it had perceived the invalidity of the part which we have held to be unconstitutional, particularly when

that body failed to incorporate a saving clause. We are not empowered to amend a solemn enactment of the General Assembly as is proposed to be done in this case.

The foregoing conclusion is strengthened by the action of the General Assembly in overriding the Governor's veto of Item (h). In his veto message, the Governor stated: "Under this item, the State funds appropriated in the Act for health purposes could be used by the local authorities of a county for any other public purpose. It is not proper to permit State funds appropriated for the development of the health program to be diverted to other purposes. State funds for health should be earmarked for health purposes alone, and this item should not be permitted to remain in the Act." The effect of the provision under consideration was thus strikingly brought to the attention of the General Assembly. The importance which it attached to this feature of the Act is irrefutably shown by its action in promptly overriding the Governor's veto of Item (h). Undoubtedly the authority to use the funds allocated to the counties for any public purpose was deemed vital by the members of the General Assembly and was a material inducement for distributing these funds among the counties.

The statute is not one appropriating distinct amounts for several purposes, one of which is invalid. If a particular amount had been appropriated for hospital and health centers and another for other public purposes, there would be more force in the argument for separability. Here we have a lump sum appropriation of $2,584,000.00 which may be used for several purposes, one of which is conceded to be invalid.

*Gaud v. Walker, supra,* and *Moseley et al. v. Welch et al.,* 209 S. C. 19, 39 S. E. (2d) 133, are cited in the majority opinion as supporting the theory of separability. Besides the difference in the factual situations presented, an examination of the acts involved in these cases discloses that each contained a saving clause.

I am unable to see how the question of separability as presented in this case is affected by Section 23, Article 4 of the Constitution. We are not concerned here with the question of whether the Governor was empowered to veto Item (h). Certainly it was never contemplated that this section of the Constitution should have the effect of rendering an act passed over the Governor's veto immune from attack on the ground that the invalid part is inseparable from the remainder. I see no basis for the analogy sought to be made in the majority opinion between the elimination of an item in an appropriation bill by the veto of the Governor and its elimination by the Court on the ground of unconstitutionality. As pointed out in *Doran et al. v. Robertson et al.,* 203 S. C. 434, 27 S. E. (2d) 714, 717, "the constitutional authority of the executive to veto is in the nature of a legislative power." The courts have no such power. When the Governor vetoes an item in an appropriation bill, the intent of the General Assembly as to its retention is evidenced by its action in passing on the veto, but when an item in an appropriation bill is declared unconstitutional by the Court, there is no opportunity for the General Assembly to determine whether the appropriation should be enacted after striking out the unconstitutional part.

I shall next consider the construction placed by the Court on Item (f) and its effect upon the other portions of the Act. This item authorizes the use of the funds appropriated to the respective counties "for any other eleemosynary hospitals in said counties whether or not such hospital is a county or municipal owned institution." It is conceded in the majority opinion that this language is sufficiently broad and comprehensive to include aid to sectarian hospitals and that the Constitution forbids the use of public funds for such a purpose, but the Court concludes that there is no allegation in the complaint that the governing authority of any county intends to use these funds to aid sectarian hospitals and that it will be assumed that the corporate authorities of the coun-

ties will not do so. I do not think the Court is at liberty to thus restrict the language used in this provision. "It has * * * been said that a statute which by general language includes in a single class those within and those without a class as to which legislation is constitutionally permitted may not be limited by judicial construction to the latter class and then sustained; and that where the legislature of a state has made no limitation or exception, the legal presumption is that it is intended to make none, and it would be judicial legislation for a court to do so." 11 Am. Jur., Constitutional Law, § 100, page 735.

It is unreasonable and impractical to say that the plaintiff must rest upon the assumption stated by the Court and can take no action to prevent an unlawful expenditure of these funds until some overt act toward this end is committed or threatened by the governing board of a county. It would be just as plausible, and in practice perhaps more so, to argue that since everybody knows that a legislative act is presumed to be constitutional, the governing board of a county will do the natural thing and follow the authority given it by the legislative act. "When courts are considering the constitutionality of an act, they should take into consideration the things which the act affirmatively permits, and not what action an administrative officer may or may not take." *Northern Cedar Co. v. French,* 131 Wash. 394, 230 P. 837, 843. To the same effect, see *Rassner v. Federal Collateral Soc. Inc.,* 299 Mich. 206, 300 N. W. 45; *Anne Arundel County Com'rs. v. English,* 182 Md. 514, 35 A. (2d) 135.

A somewhat similar situation arose in *Moseley et al. v. Welch et al., supra,* 209 S. C. 19, 39 S. E. (2d) 133, 141. It was there sought by an act of the General Assembly, Act March 20, 1944, 43 St. at Large, p. 1368 *et seq.* to provide a county unit plan of education for Williamsburg County. Section 2 of the Act provided in effect that all school funds thereafter collected should be credited to the County Board Fund. This section violated the provision of the Constitution

which required that the proceeds of the poll tax should be expended for school purposes in the several school districts in which it was collected. The Court stated: "Appellants concede that Section 2 of this Act places all school funds, including those collected from the poll tax, to the credit of the County Board Fund and that it would be unlawful for the County Board to expend the receipts from poll taxes in any district other than in the one from which they were collected, but contend that the Constitution would not be violated until the Board attempted to improperly expend the funds." This contention was overruled and the section mentioned held unconstitutional.

My conclusion is that Item (f) should also be declared invalid. For the reasons stated in the consideration of Item (h), I do not think Item (f) is separable from that which remains. It and the other provisions are mutually dependent upon each other.

I would declare the entire act void upon the ground that the invalid parts (Items h and f) are inseparable from the remainder. It would serve no useful purpose for me to discuss or express an opinion upon the other questions decided in the majority opinion. Some of them are of major public importance upon which I prefer to reserve my decision.

TAYLOR, J., concurs.